SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS"), Baylor St. Luke's Medical Center ("BSLMC"), Baylor College of Medicine ("BCM"), Surgical Associates of Texas, P.A. ("SAT") (BSLMC, BCM, and SAT hereinafter collectively referred to as the "Defendants"), and Dr. Jeffrey Morgan ("Relator") (all signatories to this agreement hereafter collectively referred to as "the Parties"), through their authorized representatives.

RECITALS

A.    BSLMC is a joint venture between BCM and CommonSpirit Health (formerly Catholic Health Initiatives).  BSLMC operates a teaching hospital (formerly known as St. Luke's Episcopal Hospital) in the Texas Medical Center.  BSLMC is an enrolled Medicare provider.

B.    BCM is a medical school and research institution in Houston, Texas.  Among other things, BCM employs teaching physicians and medical residents.  Baylor College of Medicine d/b/a AMS Baylor and Baylor College of Medicine d/b/a BCM Physicians are enrolled Medicare providers.

C.    SAT is a medical practice group of cardiothoracic surgeons.  SAT is an enrolled Medicare provider.

D.    Dr. Jeffrey A. Morgan was previously employed by BCM as a Professor with tenure Division Chief of the Division of Cardiothoracic Transplantation and Circulatory Support. He resigned from BCM and relinquished his staff privileges at BSLMC prior to filing the *qui tam* action described in Recital E below.

E.    On August 7, 2019, Relator filed a *qui tam* action in the United States District Court for the Southern District of Texas, captioned *United States ex rel. Morgan v. Baylor St. Luke's*

*Medical Center et al.* (4:19-cv-2925), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action"), against BSLMC, BCM, as well as Dr. Joseph Coselli, Dr. Joseph Lamelas, and Dr. David Ott.  The Relator filed a First Amended Complaint on July 29, 2022, which added Defendant SAT. A Second Amended Complaint was filed on September 26, 2022.

      F.     The United States contends that Defendants submitted or caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll ("Medicare").

      G.     The United States contends that it has certain civil claims against Defendants arising from false claims submitted to Medicare based on the following alleged conduct during the period June 3, 2013 to December 21, 2020.  Specifically, the United States contends that Defendants submitted or caused to be submitted false claims to Medicare for reimbursement for heart surgeries (and related hospital and professional services) performed by Drs. David Ott, Joseph Coselli, and Joseph Lamelas.  The United States alleges that those claims were false because the services performed by Drs. Coselli, Lamelas, and Ott—the "teaching physicians" in the relevant surgical cases discussed in this Paragraph—had not met the Medicare billing requirements concerning concurrent surgeries and the supervision of residents when they oversaw surgeries in multiple operating rooms at one time.  The United States alleges that certain of these surgeries and hospital and professional services did not qualify for payment because one or more of the following occurred:

    i.    The teaching physician was absent from the surgical timeout, which is a critical portion of the surgery;

    ii.    The teaching physician was not immediately available during the entirety of the surgery;

    iii.    The teaching physician presented a false attestation as to their presence during the surgery;

    iv.    The teaching physician did not provide any attestation as to their presence during the surgery;

v. The teaching physician falsely attested to the need for a second-attending surgeon (in lieu of a resident or fellow) when the second-attending surgeon was merely used to enable the teaching physician to run two operations simultaneously;

vi. On isolated occasions, the teaching physician was overseeing three operations at one time; and

vii. Patients were not aware that their surgeon would be handling multiple surgeries at one time, and therefore did not provide informed consent for the services rendered.

The conduct described in this Paragraph is referred to below as the "Covered Conduct."

H. This Settlement Agreement is neither an admission of liability by Defendants nor a concession by the United States that its claims are not well founded. Defendants specifically deny the United States' allegations.

I. Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees and costs.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

TERMS AND CONDITIONS

1. Defendants shall pay to the United States (i) fifteen million dollars ($15,000,000) ("Settlement Amount"), of which seven million five hundred thousand ($7,500,000) is restitution, and (ii) interest on the Settlement Amount at a rate of 4.5% per annum from April 19, 2024. Payment shall be made no later than 14 days after the Effective Date of this Agreement by electronic funds transfer pursuant to written instructions to be provided by the Office of the United States Attorney for the Southern District of Texas.

2. Conditioned upon the United States receiving the Settlement Amount and as soon as feasible after receipt, the United States shall pay 20.5% of the Settlement Amount and applicable

interest (*i.e.*, $3,075,000 plus 20.5% of applicable interest) to Relator by electronic funds transfer ("Relator's Share").

3.     Defendants have agreed to pay Relator a certain amount in satisfaction of his claim for attorneys' reasonable fees, costs and expenses incurred in this matter. The terms of that agreement are addressed by separate agreement.

4.     Subject to the exceptions in Paragraph 6 (concerning reserved claims) below, and upon the United States' receipt of the Settlement Amount plus interest due under Paragraph 1, the United States releases the Defendants (together with their current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them) from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

5.     Subject to the exceptions in Paragraph 6 (concerning reserved claims) below, and upon the United States' receipt of the Settlement Amount plus interest due under Paragraph 1, Relator, for himself and for his heirs, successors, attorneys, agents, and assigns, releases the Defendants together with their current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors, attorneys, agents and assigns of any of them; the current and former officers, directors, trustees, employees, faculty, and medical staff thereof; and the heirs, successors, attorneys, agents and assigns of the individual Defendants, from any civil monetary claims the Relator has on behalf of himself or on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733, and any claims Relator has asserted, could have

4

asserted, or may assert in the future, related to the Covered Conduct,  the allegations in the Civil

Action, and/or arising from the filing of the Civil Action except as provided for in this Agreement.

6.      Notwithstanding the releases given in Paragraph 4 of this Agreement, or any other

term of this Agreement, or any other term of this Agreement, the following claims and rights of

the United States are specifically reserved and are not released:

     a.   Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

     b.   Any criminal liability;

     c.   Except as explicitly stated in this Agreement, any administrative liability or
        enforcement right, including mandatory or permissive exclusion from
        Federal health care programs;

     d.   Any liability to the United States (or its agencies) for any conduct other than
        the Covered Conduct;

     e.   Any liability based upon obligations created by this Agreement; and

     f.   Any liability of individuals.

7.      Relator and his heirs, successors, attorneys, agents, and assigns shall not object to

this Agreement but agrees and confirms that this Agreement is fair, adequate, and reasonable under

all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).  Conditioned upon Relator's receipt

of the Relator's Share, Relator and his heirs, successors, attorneys, agents, and assigns fully and

finally release, waive, and forever discharge the United States, its agencies, officers, agents,

employees, and servants, from any claims arising from the filing of the Civil Action or under 31

U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil

Action.


8.      Defendants waive and shall not assert any defenses they may have to any criminal

prosecution or administrative action relating to the Covered Conduct that may be based in whole

or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the

Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

9.      Defendants fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Defendants have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation or prosecution thereof.

10.     Defendants, together with their current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors, attorneys, and assigns of any of them;, fully and finally release the Relator, his heirs, successors, attorneys, agents, and assigns, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Defendants, together with their current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors, attorneys, and assigns of any of them,  have asserted, could ever have asserted, or may assert in the future against the Relator, related to the Civil Action and the Relator's investigation and prosecution thereof.

11.     The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (*e.g.*, Medicare Administrative Contractor, fiscal intermediary, or carrier) or any state payer related to the Covered Conduct; and Defendants agree not to resubmit to any Medicare contractor or any state payer any previously denied claims related to the Covered Conduct, agree not to appeal any such denials of claims, and agree to withdraw any such pending appeals.

12.     Defendants agree to the following:

        a.      Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395lll and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Defendants, their present or former officers, directors, employees, shareholders, and agents in connection with:

     i.    the matters covered by this Agreement;

    ii.    the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

   iii.    Defendants' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

   iv.    the negotiation and performance of this Agreement;

    v.    the payment Defendants make to the United States pursuant to this Agreement and any payments that Defendants may make to Relator, including costs and attorneys' fees; and

are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP) (hereinafter referred to as Unallowable Costs).

        b.      Future Treatment of Unallowable Costs:  Unallowable Costs shall be separately determined and accounted for in nonreimbursable cost centers by Defendants, and Defendants shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Defendants or any of their subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.  Defendants will separately account for all Unallowable Costs through (1) accounting records, to the extent possible; (2) memorandum records, including diaries and

informal logs, where accounting records are not available; or, (3) good faith itemized estimates, where no other accounting basis is reasonably available.

   c.  <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: Defendants further agree that within 90 days of the Effective Date of this Agreement they shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Defendants or any of their subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. Defendants agree that the United States, at a minimum, shall be entitled to recoup from Defendants any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment. Defendants shall identify these unallowable costs through: 1) accounting records to the extent that is possible; 2) memorandum records including diaries and informal logs, regardless of whether such records are part of official documentation, where accounting records are not available; and 3) itemized estimates where no other accounting basis is available.

  Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Defendants or any of their subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this

paragraph) on Defendants or any of their subsidiaries or affiliates' cost reports, cost statements, or information reports.

     d.    Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Defendants' books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this paragraph.

13.    Defendants agree to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement. Upon reasonable notice, Defendants shall encourage, and agree not to impair, the cooperation of its directors, officers, and employees, and shall use their best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. Defendants further agree to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

14.    This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraphs 4, 5, 9, 10, and 15 (waiver for beneficiaries paragraph below).

15.    Defendants agree that they waive and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third-party payors based upon the claims defined as Covered Conduct.

16.    Upon receipt of the payment described in Paragraph 1, above, the United States and Relator shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action pursuant to Rule 41(a)(1).

17.     Except as otherwise agreed to by the separate agreement referenced in Paragraph 3 above, each party to this agreement shall bear their own legal costs or legal costs they have incurred on behalf of any other individual or entity in connection with this matter and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

18.     Each Party and signatory to this Agreement represents that he or it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

19.     This Agreement is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Southern District of Texas, Houston Division.  For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

20.     This Agreement constitutes the complete agreement between the Parties.  This Agreement may not be amended except by written consent of the Parties.

21.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

22.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

23.     This Agreement is binding on Defendants' successors, transferees, heirs, and assigns.

24.     This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

25.     All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

26.     This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date of this Agreement").  Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

### THE UNITED STATES OF AMERICA

DATED: 6/13/2024          BY: _____

Brad Gray
Assistant United States Attorney
Southern District of Texas

DATED: 06/11/24          BY: SUSAN GILLIN  Digitally signed by SUSAN GILLIN
                                            Date: 2024.06.11 10:15:06 -04'00'
_____

Susan E. Gillin
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

**BAYLOR ST. LUKE'S MEDICAL CENTER**

DATED: 06/10/2024          BY:

T. Douglas Lawson, Ph.D.
SVP of Operations, CommonSpirit Health, South Region

DATED: 06/10/2024          BY:

Kevin Coffey
Polsinelli PC
*Counsel for Baylor St. Luke's Medical Center*

12

**BAYLOR COLLEGE OF MEDICINE**

DATED: 6/7/2024     BY: _____

Robert F. Corrigan, Jr.
Senior Vice President, General Counsel
Baylor College of Medicine

DATED: 6/7/2024     BY: _____

Frederick Robinson
Caitlin Chambers
Reed Smith LLP
*Counsel for Baylor College of Medicine*

13

SURGICAL ASSOCIATES OF TEXAS, P.A.

DATED: 6/10/24          BY: _____

Charles H. Hallman, M.D.

DATED: 6/6/2024          BY: _____

Chad Geisler
Barbara Jordan
Germer PLLC
*Counsel for Surgical Associates of Texas, P.A.*

14

**RELATOR – JEFFREY A. MORGAN, M.D.**

DATED: 6/6/94          BY: _____

Jeffrey A. Morgan, M.D.


DATED: _____     BY: _____

David Warden

Joe Ahmad

Nathan Campbell

Ahmad Zavitsanos & Mensing PLLC

*Counsel for Relator*

## <u>RELATOR – JEFFREY A. MORGAN, M.D.</u>

DATED: _____     BY: _____
                          Jeffrey A. Morgan, M.D.

DATED: 6-6-2024  BY: _____
                          David Warden
                          Joe Ahmad
                          Nathan Campbell
                          Ahmad Zavitsanos & Mensing PLLC
                          *Counsel for Relator*

15

United States Courts
Southern District of Texas
F I L E D

SEP 2 6 2022

Nathan Ochsner, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

    *ex rel.,*

[UNDER SEAL],

    Relator,

    v.

[UNDER SEAL],

    Defendants.

C. A. NO.: 19-CV-2925

JURY TRIAL REQUESTED

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)

---

### RELATOR'S SECOND AMENDED COMPLAINT

---

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | C. A. NO.: 19-CV-2925 |
| *ex rel.,* | JURY TRIAL REQUESTED |
| JEFFREY A. MORGAN, | FILED UNDER SEAL |
| Relator, | PURSUANT TO 31 U.S.C. § 3730(b)(2) |
| v. | |
| BAYLOR ST. LUKE'S MEDICAL CENTER; BAYLOR COLLEGE OF MEDICINE; DAVID A. OTT, M.D.; JOSEPH COSELLI, M.D.; JOSEPH LAMELAS, M.D.; and SURGICAL ASSOCIATES OF TEXAS, P.A., | |
| Defendants. | |

## RELATOR'S SECOND AMENDED COMPLAINT

Relator files this Second Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a), the Defendants having not yet been served due to the on-going investigation by the Department of Justice and the case being under seal pursuant to 31 U.S.C. § 3730(b). This complaint is also served on the United States in accordance with 31 U.S.C. § 3730(b)(2), and it relates back to Relator's prior filings pursuant to Federal Rule of Civil Procedure 15(c).

## I.    INTRODUCTION

1.     This is an action by Dr. Jeffrey A. Morgan on behalf of the United States of America, to recover damages and penalties arising from Defendants' submission of fraudulent claims for

2

reimbursement to Government Payors, including Medicare, TRICARE, and Medicare Advantage Organizations ("MAOs").

2.      The Defendants defrauded the Government by submitting false bills under the Medicare program for cardiovascular surgeries they scheduled and performed in overlapping, simultaneous and concurrent manners in violation of applicable Medicare regulations, thereby violating the False Claims Act. Defendants violated the law for their mutual financial benefit. By engaging in a pervasive practice of overlapping and concurrent surgeries that violated Medicare regulations, the Defendant surgeons also made illegal referrals in violation of the Stark Law to the benefit of the Defendant medical school and hospital with which they were financially affiliated. The Defendant surgeons' lucrative compensation with those entities was neither fair market value nor commercially reasonable and was necessarily tethered to the increased surgical volume and revenues afforded by the overlapping surgery program.

3.      Since at least 2013, cardiovascular teaching surgeons at Baylor College of Medicine and its affiliated hospital, Baylor St. Luke's Medical Center (collectively, "Baylor"), knowingly left unqualified physician trainees (residents and fellows) alone in operating rooms to operate on unwitting patients so the teaching surgeons could run multiple surgeries simultaneously. These teaching surgeon Defendants—Dr. Ott, Dr. Coselli, and Dr. Lamelas—then falsely attested that they were present throughout each of the simultaneous surgeries to hide from the Government the submission of false claims for reimbursement for services they did not perform, or which were performed in violation of applicable Medicare legislation and regulations.

4.      The linchpin to the success of the Defendants' false billing scheme was falsifying the patients' medical records. A physician lies when he attests in the medical records for two separate but simultaneous procedures, that he was "present during the entire procedure" for both.

3

There are many examples of teaching physicians at Baylor doing exactly this, and similar deceptive attestations to the same effect.

5.      For example, on ███████ 2015, Defendant Ott, former Chief of the Cardiovascular Service of Baylor St. Luke's Medical Center, was scheduled for surgery on two different patients in two different operating rooms beginning at 7:30 a.m. and ending at 9:00 a.m.:

| CVOR 06 | 0730 0900 | Bypass,Aorta Coronary Ima/Svg - N/A Endoscopic Harvest Vein - N/A | D. Ott, MD | Daniel A. T. Ricky Singh H. | Lea Stein M. Raymond F S. Kathleen K. Adonis T A. Qian N | 0730 |
| CVOR 06 | 0900 1030 | Bypass,Aorta Coronary Ima/Svg - N/A Endoscopic Harvest Vein - N/A | D. Ott, MD | Daniel A. T. Ricky Singh H. James Michael A. | Raymond F S. Lea Stein M. Terry Newton C. Qian N | 0900 |
| CVOR 07 | 0730 0900 | Bypass,Aorta Coronary Off Pump - N/A | D. Ott, MD | Kishan D. | Dolores H. Jennifer A W. Neil William Y. Nicole M B. | 0730 |

6.      Despite the fact that these procedures overlapped completely, Defendant Ott attests that he was present at both the entire time:

**Attending Attestation:**   David Ott, MD was present during the entire procedure

7.      Similarly, on ███████ 2015, Defendant Ott was scheduled to perform heart surgery from 7:30 a.m. to 8:15 p.m. on one patient and from 7:30 a.m. to 4:33 p.m. on another, ███ year-old, patient:

| CVOR 07 | 0730 2015 | Replacement,Valve Aortic - N/A Repair,Aata (Aneurysm Ascending Thoracic Aorta) (psb) - N/A Ligation Atrial Appendage - N/A | 765 D. Ott, MD | Samuel Justin H. Victoria G. | Nicole M B. Jane Frances D D. Shela E E. Michael Patrick C. Roseman Christine G. Jennifer A W. | ███ |
| CVOR 06 | 0730 1633 | Valvuleplast/Mitral - N/A Tee - N/A | 543 D. Ott, MD | Daniel A. T. Jason K. A. | Allison L B. Maliheh L M. Mei L. James Grantland E. Jennifer A W. | ███ |

4

As before, Defendant Ott attested to being present for the entire time of both procedures. He did this even though all nine hours of surgery for the ▮ year-old occurred during the first nine hours of surgery for the first patient.

8.     Defendant Ott was not the only doctor at Baylor falsely claiming to be present during several surgeries at once. The Director of Baylor College of Medicine's accredited Thoracic Surgery Residency Program, Defendant Coselli, did the same. On ▮ 2018, Defendant Coselli was scheduled to perform more than 32 hours of surgery over a 16-hour period. On that day, every single hour between 7:50 a.m. and 2:00 a.m. the next morning was booked with *two to four* concurrent surgeries.

9.     In another example, on ▮ 2013, Defendant Coselli had two septuagenarian patients scheduled for heart surgery from 7:30 a.m. and 9:00 a.m. Both patients ended up on bypass for over two hours, which caused those simultaneous surgeries to overlap with Defendant Coselli's next surgery, scheduled for 9:00 a.m. Defendant Coselli falsely attested that he was present during the entirety of all three procedures.

10.     In similar fashion, Defendant Lamelas performed hundreds of simultaneous overlapping surgeries in his short two-year stint at Baylor, often attesting in the medical record for each case that "I performed this procedure," when it would have been physically impossible to do so for both overlapping cases. In a conversation that took place while both were standing outside the intensive care unit, Defendant Lamelas confided to Relator that his compensation package was based on a pay-per-procedure structure such that the more procedures Defendant Lamelas billed, the more he would get paid; thus, incentivizing Defendant Lamelas to consistently double book his surgical patients.

5

11.     This is just the tip of the iceberg. There are many examples of seasoned heart surgeons at Baylor making false statements about being present for the entirety of multiple simultaneous surgeries over the ten-year period before this case was filed.

12.     Baylor knew about and facilitated the submission of these false statements by its teaching physicians. Baylor scheduled the operating rooms for overlapping surgeries, provided the teaching physicians with resources to run simultaneous surgeries, and provided physician trainees to perform surgeries while the teaching physicians were not present. To this point, the Defendant hospital provided each of the Defendant surgeons with two dedicated operating rooms simultaneously per day. Importantly, Baylor routinely audited teaching physicians' submissions for Medicare reimbursement, including Drs. Coselli, Lamelas, and Ott. By comparing the operating room schedules and the attestations its teaching physicians made, Baylor knew, or should have known, that its teaching physicians were making false statements in the patients' medical records that were used to submit reimbursements to the Government.

13.     To make matters worse, Baylor itself then submitted claims for reimbursement of hospital inpatient expenses for the overlapping and concurrent surgeries that relied on the false submissions by the teaching physicians.

14.     The false statements have been material to the federal government's payments to the Defendants. Medicare does not reimburse physicians in teaching settings if the critical portions of two surgeries overlap, or if the teaching physicians were not physically present during all critical portions and immediately available to assist during non-critical portions. Medicare likewise requires submission for inpatient costs reimbursement to be true, accurate, and complete without the misrepresentation or concealment of material facts. By falsely attesting that they were present during surgeries when they were not, teaching physicians at Baylor covered up their regulatory

violations, and Defendants have been able to take money from the Government under the false pretense that the teaching physicians were in operating rooms at all times they needed to be and did not leave their patients' care in the hands of their trainees. By then submitting claims for related inpatient costs, Baylor also misrepresented that the underlying procedure had been performed as it should have been to be eligible for reimbursement.

15.     All Defendants benefited financially from the scheme. By scheduling overlapping surgeries, the hospital increased its revenues between 2013 and 2019 by about $150 million from just these three surgeons' cases alone. The surgeons, meanwhile, enjoyed compensation packages some four-times higher than the average for their specialty in Houston, reaching over $2 million each per year. As the Hospital Chief Surgeon and Medical School Chief of Surgery acknowledged: "Cardiac surgery is the financial engine of the Hospital." In short, the teaching physicians churned through as many cardiac surgeries as possible to generate revenue for Baylor, regulations be damned, and were rewarded with lavish compensation. The scheme could not have been carried out for so long without the concerted conspiracy of all Defendants to defraud the Government.

16.     Overlapping surgeries are permitted to facilitate the use of highly skilled surgeon resources more efficiently, but the regulations for teaching physicians need to be strictly followed to ensure adequate patient care and training of medical students, and honest billing to the Medicare program. The Defendants have engaged in hundreds of incidents of brazen lies and misleading, incomplete deceptive statements to falsify the medical records for overlapping cases to hide from the Government the violations of applicable Medicare regulations very effectively. Moreover, by shirking their obligations to be demonstrably present, the Defendant surgeons were able to facilitate generation of more hospital revenue, including Medicare reimbursements, to justify their

7

disproportionate salaries. The Defendants thereby created an illicit financial relationship for the purpose of increasing Medicare reimbursements—a textbook Stark Law violation.

17.     The Government had no way of knowing about the Defendants' fraud until the Relator came forward with his disclosure statement on July 31, 2019.

18.     Relator knows of Defendants' misconduct in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et. seq.* and the Stark Law, 42 U.S.C. § 1395nn *et. seq.*, and brings this action on behalf of the federal government to seek all available relief.

## II.     JURISDICTION AND VENUE

19.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

20.     This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

21.     This Court has personal jurisdiction over Defendants Baylor St. Luke's Medical Center, Baylor College of Medicine, Ott, Coselli, and Surgical Associates of Texas, P.A. because their contacts with Texas are so continuous and systematic as to render them at home in Texas:

   a.  Defendants Baylor St. Luke's Medical Center and Baylor College of Medicine are nonprofit Texas corporations with their principal places of business in Texas.

   b.  Defendants Ott and Coselli are domiciled in Texas.

   c.  Defendant Surgical Associates of Texas, P.A. is a professional association with its principal place of business in Texas.

22.     This Court has personal jurisdiction over Defendant Lamelas because the acts he performed in Texas give rise to the claims against him.

23.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because:

   a.  Defendants operate within or reside within this District;

   b.  Defendants transact business primarily within this District and did so at all times relevant to this Second Amended Complaint and the prior complaints; or

8

      c.    Defendants committed acts proscribed by the False Claims Act—giving rise to this action—within this District.

24.     Before filing the Original Complaint on August 7, 2019, Relator served a written Disclosure Statement on the Department of Justice on July 31, 2019, setting forth the information Relator possesses, pursuant to 31 U.S.C. § 3730(b)(2). Relator also serves a copy of this Second Amended Complaint upon the United States of America pursuant to 31 U.S.C. § 3730(b)(2).

25.     Relator has complied with all other conditions precedent to bringing this action.

26.     This action is not based on any public disclosure, as that term is defined in 31 U.S.C. § 3730(e)(4)(A).

### III.   PARTIES

27.     Plaintiff is the United States of America, who at the time of the filing of the Original Complaint and this Second Amended Complaint, has not yet made an intervention decision.

28.     Relator, Jeffrey Morgan, M.D., is a United States citizen who at the time of filing this case resided in Houston, Texas. He is represented by counsel, and he brings this action on behalf of the United States of America. Dr. Morgan was employed by Baylor College of Medicine from January 2, 2016 to May 7, 2019. During this time, Dr. Morgan held several titles, including: Professor of Surgery (tenured) – Baylor College of Medicine; Lester and Sue Smith Chair in Surgery – Baylor College of Medicine; Chief, Division of Cardiothoracic Transplantation and Circulatory Support – Baylor College of Medicine; Surgical Director, Advanced Heart Failure Center – Baylor College of Medicine; Fellowship Director, Mechanical Circulatory Support, Heart Transplant, and Lung Transplant – Baylor College of Medicine; Surgical Director, Mechanical Circulatory Support and Cardiac Transplantation – Baylor Saint Luke's Medical Center; and Director of Cardiovascular Surgery Research – Texas Heart Institute.

9

29.     Defendant Baylor St. Luke's Medical Center (CHI St. Luke's Health Baylor College of Medicine Medical Center d/b/a Baylor St. Luke's Medical Center) is a nonprofit corporation operating in the State of Texas. Defendant may be served through its registered agent for service of process: CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

30.     Defendant Baylor College of Medicine is a nonprofit corporation operating in the State of Texas. Defendant may be served through its registered agent for service of process: James Banfield, One Baylor Plaza, Suite 106A, Houston, TX 77030.

31.     Defendant Joseph S. Coselli, M.D. is a Texas resident in Harris County, who may be served with process at                                                            or wherever he may be found.

32.     Defendant David A. Ott, M.D. is a Texas resident in Harris County, who may be served with process at                                                       or wherever he may be found.

33.     Defendant Joseph Lamelas, M.D. is a Florida resident, who may be served with process a                                                        or wherever he may be found.

34.     Defendant Surgical Associates of Texas, P.A. (SAT) is a Texas professional association which was or is owned by Defendant David A. Ott, M.D., which may be served with process through its registered agent for service of process: Katherine A. Hatcher, 1101 Bates Ave., Suite P514, Houston, Texas 77030, or wherever she may be found.

## IV.     STATUTORY AND REGULATORY FRAMEWORK

### A. The False Claims Act.

35.     The False Claims Act broadly penalizes claiming or keeping payments from the federal government based on certain false statements. Specifically, the statute provides in relevant part that anyone who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

10

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspir[es] to commit a violation of subparagraph (A), (B) . . . or (G); . . . or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United State Government for a civil penalty of not less than $5,000 and not more than $10,000 as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [28 U.S.C. § 2461], plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a).

36.     The terms "knowing" and "knowingly" mean that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729.

**B. Government payment programs.**

37.     Medicare is a federal healthcare program benefitting primarily the elderly and the disabled. It is funded by the federal government.

38.     Medicare Part A covers the cost of certain inpatient hospital services. Medicare Part B covers the cost of certain physician services. Included among Medicare Part A coverage are resident salaries and hospital services, including operating rooms and associated equipment, nursing staffs, and inpatient services associated with surgical procedures. Included among Medicare Part B is the cost of teaching physician services when strict regulations are met, as referenced below. Medicare Part C (also known as Medicare Advantage and Medicare+Choice) plans are offered to Medicare patients by private entities called Medicare Advantage Organizations ("MAOs") that are funded by the federal government.

39.     The Centers for Medicare & Medicaid Services ("CMS") is the federal agency within the United States Department of Health and Human Services that administers Medicare.

40.     TRICARE is a federal healthcare program benefitting primarily active duty military personnel, certain retirees, and their families. TRICARE is funded by the federal government.

41.     Medicare, MAOs, and TRICARE are referred to collectively as "Government Payors."

### C. Laws and regulations for Government Payor healthcare payments.

#### 1.     Medicare legal and regulatory framework.

42.     Healthcare providers enter provider agreements with the Secretary of the Department of Health & Human Services in order to participate in Medicare. Medicare pays the provider for covered inpatient and outpatient services provided to Medicare beneficiaries.

43.     When applying to enroll in Medicare, an authorized officer of institutional providers commits to legally and financially binding the institution to the laws, regulations, and program instructions of the Medicare program.

44.     Institutional providers such as hospitals submit their Medicare Part A claims electronically, or—in certain circumstances—on CMS Form 1450. The submissions require the institution to certify, among others, that: (1) the information presented is true, accurate and complete; and (2) that the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

45.     Moreover, institutional providers such as hospitals must submit annual cost reports to enable proper determination of Medicare costs payable for the prior year. *See* 42 C.F.R. § 413.20(a)–(b); 42 C.F.R. § 413.24(f). The form for the hospital cost report requires the chief financial officer or administrator of the institution to certify that the data submitted is true, correct, complete, and prepared in accordance with applicable instructions.

12

46.     Providers such as physicians submit their Medicare Part B claims electronically, or—in certain circumstances—on CMS Form 1500. The submissions require the provider to certify, among others, that: (1) the information presented is true and complete; (2) that sufficient information is provided to allow the government payor to make informed eligibility payment decisions; (3) that the claim complies with all applicable regulations and program instructions for payments to Medicare; and (4) that the services were personally furnished by the provider or under the provider's direct supervision, unless an express exception applies.

47.     In a teaching hospital setting at issue here, for teaching physicians to be eligible for payment under Part B, the surgical service generally must be furnished by a physician who is not a resident or fellow, or the services must be furnished by a resident or fellow in the presence of a fully licensed teaching physician (with limited exception). 42 C.F.R. § 415.170(a)–(b).

48.     If the resident or fellow participates in the service furnished in a teaching setting, the teaching physician must be present during the key portion of any service or procedure for which payment is sought. 42 C.F.R. § 415.172(a).

49.     In the case of surgical procedures, such as those at issue here, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. 42 C.F.R. § 415.172(a)(1).

50.     If the critical portions of two surgeries are concurrent, a teaching physician is not eligible for Part B reimbursement. *See id.*

51.     If the non-critical portions of two surgeries overlap, a teaching physician must be immediately available to assist or have another qualified physician present, or the teaching physician is not eligible for Part B reimbursement. *See id.*

13

52.     If the teaching physician does not include documentation with his or her claim showing compliance with these requirements, the teaching physician is not eligible for Part B reimbursement. *See* 42 C.F.R. § 415.172(b).

53.     Moreover, hospitals must ensure that patients receive adequate information to be involved in their "care planning and treatment, and be[] able to request or refuse treatment." 42 C.F.R. § 482.13(a)(1) & (b)(2). A properly executed informed consent form must be in the patient's chart before surgery and must conform to regulatory requirements. 42 C.F.R. § 482.13 & 482.51.

54.     Requirements for billing second attending in a teaching setting must strictly comply with 42 C.F.R. § 415.190 (certification that no resident was available).

55.     Medicare providers must make restitution to Medicare when overpayments are identified unless the provider is without fault. *See* 42 C.F.R. § 489.20(b).

**2.      TRICARE Regulatory framework.**

56.     Before benefits can be paid under TRICARE, a claim containing accurate information about medical services provided must be submitted. *See* 32 C.F.R. § 199.7(a)(2).

57.     CMS Forms 1450 and 1500 , and their corresponding electronic forms, are used for TRICARE claim submissions.

**D. The Stark Law.**

58.     The Physician Self-Referral Law, codified as amendments to the Social Security Act, 42 U.S.C. § 1395nn *et seq.* (commonly known as the "Stark Law"), prohibits a hospital (or other entity) from submitting Medicare claims for payment for "designated healthcare services" furnished pursuant to referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital. The Stark Law is a strict liability statute, and violations are actionable pursuant to the False Claims Act.

14

59.     Though the Stark Law has certain exceptions regarding appropriate physician financial relationships, *e.g.*, that compensation is at fair market value, that the financial relationship is commercially reasonable, that the physician personally performed the services involved, or that compliance with all federal regulations governing billing or claims submission have been met; the Defendants have failed to qualify for any exception.

60.     The Defendant surgeons all hold, or held at relevant times, high supervisory positions at each Baylor Defendant simultaneously, and they, along with Defendant SAT, have a financial relationship with each Baylor Defendant.

61.     Defendant Baylor College of Medicine holds an ownership position in Defendant Baylor St. Luke's Medical Center (https://www.bcm.edu/about-us/affiliates/baylor-st-lukes-medical-center), and regularly receives financial ownership benefits from the hospital. Thus, the Defendant medical school holds a direct financial interest in the Defendant hospital, and, on information and belief, employs the Defendant surgeons.

62.     The gravamen of the Stark Law violation issues from the massive overlapping surgery practice of the Defendant surgeons at Baylor designed to increase hospital revenues, a portion of which feathered the compensation packages of the Defendant surgeons to incentivize them to engage in the double-booking practice and refer the extra surgical volume generated to the Baylor Defendants. On information and belief, it is estimated that the Defendant surgeons conducted over 5,000 overlapped cases in the time period 2013 to 2020, and that over 2,000 of these were billed directly to Medicare or were reimbursed by the Government under MAO and TRICARE programs. Since the Defendant surgeons were not present for the entirety of each overlapping surgery, they were being compensated for work they did not personally perform. What is more, the compensation paid was neither fair market value nor commercially reasonable. Given

15

the Defendant surgeons' financial interest in the Baylor Defendants, each Medicare surgical procedure conducted in an overlapping fashion by the Defendant surgeons was an illegal referral of a healthcare service to the Baylor Defendants that could not have otherwise been performed, and by which all Defendants benefitted financially.

V.    PUBLIC CONCERN

63.    The statutory and regulatory framework governing teaching physicians double and triple booking surgeries is integral to addressing the federal government's well-publicized concern for: (1) preserving public resources; and (2) ensuring high standards of patient care and consent. This framework is also aligned with leading professional standards of care. The Defendants' false statements are therefore material to the federal government's decision to pay Defendants.

64.    In 1998, the General Accounting Office published a report to the Ways and Means Committee Subcommittee on Health of the House of Representatives regarding audits performed of physicians at teaching hospitals. The report identified the Medicare Part A and Part B methods of compensating residents and teaching physicians as "a longstanding concern because of the danger that Medicare will pay twice for the same service—once as a hospital payment under part A and again as a separately billed service under part B." The report concluded that "Medicare has issued guidance addressing when teaching physicians may bill part B for their services" in order "[t]o prevent inappropriate payments," and that "federal law has long required that teaching physicians billing part B either provide the service themselves or be physically present while a resident provides the services."

65.    Between 1995 and 2004, 36 teaching hospitals settled False Claims Act or other similar cases arising from investigations of billing practices at teaching hospitals.

66.    Between 2004 and 2016, there were nine additional settlements with teaching hospitals involving related issues.

16

67.     In 2016, in the aftermath of a *Boston Globe* exposé on concurrent surgeries, the Senate Finance Committee expressed "[a]larm[] by the allegations of patient harm, surgeon misconduct, and inappropriate billing highlighted in that article." As a result, the Committee surveyed 20 teaching hospitals about their teaching practices and policies, and examined guidance issued by CMS, and the American College of Surgeons ("ACS"). After its investigation, the Committee concluded that healthcare providers accepting Medicare payments should "[d]evelop a concurrent and overlapping surgical policy that clearly prohibits the former and regulates the practice of the latter consistent with the ACS guidance."[1]

68.     Meanwhile, the ACS has indicated, "a primary attending surgeon's involvement in concurrent or simultaneous surgeries on two different patients in two different rooms is inappropriate." Likewise, for non-critical portions of a surgical procedure "when the primary attending surgeon is not present or immediately available, another attending surgeon should be assigned to be 'immediately available.'"

69.     In 2015, the Department of Justice announced a settlement with the Medical College of Wisconsin for allegations of improperly billing Medicare for neurosurgeries involving residents who did not receive the required level of supervision from teaching physicians. There, the Department of Justice stated, "[t]he settlement we are announcing today reflects the focused, sustained, and purposeful efforts of the Justice Department, together with our partnered federal agencies, to investigate and redress fraud in our health care system."[2]

---

[1] Note, however, that the legal and regulatory framework outlined above pre-dates the Senate Finance Committee's report on concurrent surgeries. *See, e.g.*, 42 C.F.R. § 415.172 (eff. July 1, 1996).
[2] DEPARTMENT OF JUSTICE, *Medical College of Wisconsin, Inc. Pays $840,000 to Settle Alleged False Claims for Neurosurgeries* (Jan. 9, 2015), https://www.justice.gov/usao-edwi/pr/medical-college-wisconsin-inc-pays-840000-settle-alleged-false-claims-neurosurgeries (quoting United States Attorney for the Eastern District of Wisconsin, James L. Lantelle).

17

70.     In 2016, the Department of Justice announced a settlement of similar claims against the University of Pittsburgh Medical Center. In that case, the Department of Justice stated, "[b]y pursuing false claims act cases like this, we send a clear message that health care providers must follow the rules when they deal with federal health care programs, and that this Office will hold accountable those who do not."[3]

71.     In 2017, Vanderbilt University Medical Center publicly settled a False Claims Act lawsuit in which it was alleged to have billed Medicare improperly for concurrent surgeries.[4]  This settlement followed allegations that "Vanderbilt engage[d] in day-to-day scheduling and staffing practices that are designed in such a way that it is impossible for Vanderbilt to satisfy the requirements for billing those attending physician services to Medicare" but that nonetheless "Vanderbilt routinely submit[ted] false claims to federal and state health insurance programs that do not reflect its actual physician services, but rather falsely represent to the Government that Vanderbilt's attending physicians are present for, perform, or direct procedures when they have had minimal, if any, involvement in those procedures."[5]

72.     Recently, the United States filed a complaint under the False Claims Act against the University of Pittsburgh Medical Center (UPMC), University of Pittsburgh Physicians, and James Luketich, M.D., in the U.S. District Court for the Western District of Pennsylvania, after a two-year investigation into allegations originally brought by a former UPMC physician under the False Claims Act's whistleblower provisions, alleging that the defendants knowingly submitted

---

[3] DEPARTMENT OF JUSTICE, *False Claims Act Violation by UPMC Resolved for $2.5 Million* (July 27, 2016), https://www.justice.gov/usao-wdpa/pr/false-claims-act-violation-upmc-resolved-25-million (quoting United States Attorney for the Western District of Pennsylvania, David J. Hickton).

[4] Holly Fletcher, *Vanderbilt Hospital to Pay Millions over Medicare Fraud Allegations*, TENNESSEAN (July 26, 2017), https://www.tennessean.com/story/money/industries/health-care/2017/07/26/vumc-pay-millions-over-medicare-fraud-allegations/505862001/.

[5] Complaint at 3 & 5, *United States of America ex rel. John D'Alessio, M.D. v. Vanderbilt University*, No. 3:11-cv-00467 (M.D. Tenn. Jan. 6, 2011), ECF No. 1.

hundreds of materially false claims for payment to Medicare, Medicaid, and other government health benefit programs over the past six years. The complaint alleges that Dr. Luketich – the longtime chair of UPMC's Department of Cardiothoracic Surgery – regularly performs as many as three complex surgical procedures at the same time, fails to participate in all of the "key and critical" portions of his surgeries, and forces his patients to endure hours of medically unnecessary anesthesia time, as he moves between operating rooms and attends to other patients or matters. As importantly, the United States' complaint alleges that Dr. Luketich's practices violate the standard of care and the patients' trust and heighten the risk of serious complications.[6] As the Special Agent in Charge said: "When physicians and other healthcare providers put financial gain above patient well-being and honest billing of government healthcare programs, they violate the basic trust the public extends to medical professionals."[7]

73.     The Stark Law arose out of similar public concerns. It establishes the clear rule that the Government will not pay for items or services prescribed by physicians who have improper financial relationships with other providers. In enacting the statute, Congress found that improper financial relationships between physicians and entities to which they refer patients, can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, or of good quality. Congress relied upon various academic studies consistently showing that physicians who had financial relationships with hospitals and other entities used more of those entities' services than similarly situated physicians who did not have such relationships. The statute was designed specifically to reduce the loss suffered by the

---

[6] *See United States of America ex rel. Jonathan D'Cunha, M.D. v. James Luketich. et al.,* No. 19-cv-495 (W.D. Pa.).
[7] Department of Justice, U. S. Attorney's Office, Western District of Pennsylvania (September 2, 2021): United States Files Suit Against UPMC, Its Physician Practice Group, and the Chair of Its Department of Cardiothoracic Surgery for Violating the False Claims Act (https://www.justice.gov/usao-wdpa/pr/united-states-files-suit-against-upmc-its-physician-practice-group-and-chair-its).

Medicare program due to such increased questionable utilization of services. By wholesale conduct of overlapping surgeries, the Defendant surgeons have illegally referred all overlapping cases – cases that might otherwise have been performed at various competing institutions in the world-renowned Texas Medical Center.  And they did so to the mutual financial benefit of all Defendants.

## VI.   ADDITIONAL FACTS

74.    Relator incorporates all preceding paragraphs as though fully set forth herein.

75.    Dr. Morgan began working at Baylor College of Medicine in January 2016.

76.    Over the course of approximately the next three years and four months, Dr. Morgan observed and became aware of Defendants' systematic practice of scheduling cardiothoracic surgeries to occur simultaneously with the same attending surgeon listed as the lead for each surgery. All Defendants knew of this practice.  This led to the submission of false claims for reimbursement to Government Payors by the surgeon Defendants, associated professionals, and by Baylor.

77.    Baylor's operating schedule indicates that several teaching physicians have double- or triple-booked surgeries as a matter of course. The three surgeon Defendants were the most prolific, but many others at Baylor engaged in this practice. Rather than overlapping for brief periods on the margins of routine procedures, these are cases where open-heart surgeries – complex procedures by any reasonable standard – are being scheduled with the same attending physician to begin and end at exactly the same times or with several hours of concurrence.

78.    As a direct result of the simultaneous scheduling of cardiovascular surgeries, the attending teaching physicians, including the surgeon Defendants in this case, were often not present at the pre-incision timeout (a key and critical part of each procedure), routinely left a resident or fellow in the operating room alone and unsupervised performing critical surgical tasks

in these complex procedures, often falsified the patient's medical record to obscure their presence, or lack thereof, in the operating room, and *never* informed their patients that they would be scheduling their procedure simultaneously with other procedures where they were also the primary attending teaching physician. The Baylor Defendants knew this was happening on a regular basis and sanctioned it even though they knew it violated Medicare regulations.

79.     In addition to the examples of Defendant Coselli and Defendant Ott scheduled for concurrent or overlapping surgeries in 2015 incorporated from the introduction, additional examples include:

a.   On          and     2013, Defendant Coselli was scheduled to perform overlapping surgeries day after day:





21

The overlapping surgeries continued for Dr. Coselli over the course of seven days between ▮▮▮ and ▮▮▮ 2013.

b. On ▮▮▮ 2014, Defendant Ott scheduled two sets of simultaneous surgeries back-to-back, for a total of four major surgical procedures crammed into one day:

| CVOR 07 | 0730 0900 | Bypass,Aorto Coronary Off-Pump - N/A Endoscopic Harvest,Vein - N/A | 90 | D. Ott, MD | General | Samuel Justin H. Matthew K | Mona G.H. Lavonda D. Roberta K.F. Myra F.Q. Priscilla F.N. | 0730 | |
| CVOR 06 | 0735 6800 | Endarterectomy,Carotid - Right | 90 | D. Ott, MD | General | Samuel Justin H. Matthew K | Mona G.H. Lavonda D. | 0730 | |

| CVOR 06 | 0900 1032 | Bypass,Aorto Coronary Ima - N/A Endoscopic Harvest,Vein - N/A | 90 | D. Ott, MD | General | Joseph Perfecto C. Elijandra M. | Corrine N.L. Ursula T. Luc M.R. Jennifer A.W. Matthew Jacob H. Jane Frances D.D. Myra F.D. | 0900 | |
| CVOR 07 | 0900 1030 | Bypass,Aorto Coronary Ima - N/A Endoscopic Harvest,Vein - N/A Repair,Aneurysm Aortic Arch - N/A | 90 | D. Ott, MD | General | James Michael A. Robin E.Lopez F. Elijandro M. Paul Warrington Jr. B | Rebekah J.J. Maliheh L.M. Jisfory B.B. Jill K. Neil William Y. Jennifer A.W. Nathan W. Matthew Jacob H. Virgilio T.C. Tammy T. Ronald F.G. Ronald F.G. Jane Frances D.D. Priscilla F.N. Terri L.R. | 0900 | |

c. On ▮▮▮ 2018, Defendant Lamelas was scheduled for three simultaneous surgeries:

| CVOR 07 | 1030 1449 | Replacement,Valve Mitral Minimally Invasive - N/A Maze - N/A Valvuloplasty,Tricuspid Minimally Invasive - N/A | J. Lamelas, MD | Paul Warrington Jr. B Kwasi Botwe M. | | | |
| CVOR 06 | 1415 2110 | Replacement,Valve Aortic - N/A Sternotomy - N/A | J. Lamelas, MD | Paul Warrington Jr. B Brendan N. S. Daniel A. T | | | |
| CVOR 03 | 0815 1618 | Replacement,Valve Aortic - N/A Bypass,Aorto Coronary Ima,Svg - N/A Endoscopic Harvest,Vein - Left | J. Lamelas, MD | Byron E. T. Daniel R. | | | |

d. Between January 7, 2019, and January 18, 2019, there were nine days in which Defendant Coselli was scheduled to perform overlapping surgeries.

80.     In the large majority of these cases, the reports of procedure for the overlapping surgeries performed by these doctors include attestations that they were present for the entire

operation, which of course is not physically possible. Moreover, the Defendant surgeons' silence as to their presence during key or critical portions of each surgery, and never stating what those portions were, does not satisfy their Medicare regulatory obligations.

81.     Defendants then submitted, or caused to be submitted, for these surgical cases claims for reimbursement for Medicare Part B services, falsely indicating that the teaching physicians were present for all critical portions of the surgeries and had another qualified physician immediately available for non-critical portions. These claims for reimbursement falsely certified that (1) the information presented was true and complete; (2) that sufficient information was provided to allow the Government to make informed eligibility payment decisions; (3) that the claim complied with all applicable regulations and program instructions for payments to Medicare; and (4) that the services were personally furnished by the provider or under the provider's direct supervision, unless an express exception applied. On information and belief, the Defendant medical school (Baylor College of Medicine) approved and assisted the Surgeon Defendants in submitting their Medicare Part B claims for reimbursement.

82.     Defendants also submitted, or caused to be submitted, for these same surgical cases claims for reimbursement for Medicare Part A services, knowing that the surgical cases in question had been performed in violation of Medicare regulations and that the claims for Medicare Part B services were submitted in violation of Medicare regulations. These claims for reimbursement also falsely indicated (1) that the billing information for the surgical procedure in question was true, accurate, and complete; and (2) that the submitter of the claim did not knowingly or recklessly misrepresent or conceal any facts.

23

83.     Significantly, by generating and relying on medical records with false attestations, the Defendants were able to conceal the surgeons' presence in the operating room and hide Baylor's billing transgressions from the Government Payors.

84.     To make matters worse, it is not standard practice at Baylor to obtain adequate informed consent of their overlapping surgery practice.

85.     The Baylor consent forms used by the surgeons typically only provided the name of the attending physician as the person who will be doing the operation. That is, *none* of the patients operated on were told that a resident or fellow would be operating on them without a certified surgeon in the room, or that the patient's doctor of choice would be multitasking between several other surgeries at the same time as theirs.

86.     By using an informed consent form that never mentioned the possibility of overlapping surgeries, Baylor generated false medical records and thereby misled both patients and the Government. There was the appearance that patients consented to surgeries, yet there was a critical omission: disclosure that the patient's primary surgeon of choice would not be in the operating room during the entire procedure or would be scrubbed into another overlapped case. Just like with the false attestations, this would prevent Government Payors from discovering the overlapping surgery practice with regard to cases for which Baylor sought Medicare reimbursements—including Part A—or verifying that those overlapped procedures had been done consistent with Medicare billing regulations.

87.     These are non-exhaustive examples of simultaneous surgeries in which teaching physicians at Baylor falsely attested that they were present throughout the entire procedures they should have been overseeing to facilitate submission of false claims for reimbursement to Government Payors. There are over 1,000 instances like these in which the notes and attestations

24

signed by Defendant Ott state that he was present during the entirety of overlapping surgeries. From June 2013 to December 2020, the three Defendant surgeons alone performed over 7,000 cardiovascular surgeries at Baylor – this equates to over 300 cases per year on average but is much higher than that for Ott and Coselli given that Lamelas was at Baylor for only two years. It is estimated that Ott was listed as "primary" and "performed" an average of about 550 cases per year, Coselli an average of about 450 cases per year, and Lamelas over 350 cases per year. This cardiac surgical volume is more than two to four times the average number of procedures performed by cardiac surgeons in America and cannot be done without concerted overlapping simultaneous surgical procedures. It is estimated that over 80% of the surgeries during 2013-2020 by the Defendant surgeons were scheduled and conducted overlapping with another surgery with the same attending teaching physician, for all payors including the Government. Well over 1,000 of these surgical cases were conducted overlapped with another case by the same attending teaching surgeon in violation of Medicare regulations and billed directly to CMS with an average reimbursement of $50,000 to $75,000 per case, depending on the type of cardiovascular procedure. If the 10-year statute of limitation available under the False Claims Act is applied (31 U.S.C. § 3731(b)(2)), then the number of illegally billed surgeries gets much larger.

88.    The practice of overlapping surgeries was, and still is, well-known throughout the surgery department and administration at Baylor. There are at least ten other cardiovascular surgeons at Baylor who engaged in overlapping surgeries as a standard practice during this same time period, though not at the same level as Defendants. Relator regularly attended meetings with Baylor College of Medicine's Chair of Surgery, during which the operating room schedule was discussed. During these meetings, the specifics of the schedule were discussed, including how many surgeries were scheduled and with whom they were scheduled. Although hospital

administrators knew that the practice of overlapping surgeries was alive and well at Baylor and knew that surgeons were not adequately supervising these cases in violation of Medicare regulations, they did nothing to stop it because of the vast amount of revenue these surgeries generated for the institutions.

89.     Though not an element of the False Claims Act, in similar cases involving violations of regulations with respect to overlapping and concurrent surgeries, the Department of Justice has consistently admonished that strict adherence to the Medicare regulations is required to satisfy the standard of care owed to the patient and to reduce complications: "The laws prohibiting concurrent surgeries are in place for a reason: to protect patients and ensure they receive appropriate and focused medical care." [8] Baylor was aware of the high level of complications in their cardiovascular surgery practice. For example, the required institutional review of all cases in which a patient dies in the operating room revealed that Defendant Ott's practice resulted in at least four patient deaths during scheduled overlapping surgeries. Each one of these cases was reviewed by Baylor leadership, including the documentation showing that each of the surgeries leading to a patient's death were being performed overlapped with other surgeries. But death on the operating room table was not the only complication Baylor was aware of in their cardiovascular surgery practice. The tight scheduling and teaching physician rushing from one surgery to the next – and sometimes back to the first when unforeseen complications arose – was often accompanied by patients being under anesthesia much longer, excessive internal bleeding requiring re-opening the chest, heart valve sutures coming loose and requiring a complete re-do of the surgery, miss-sizing of artificial heart valves, and a myriad of other problems. All these

---

[8] Department of Justice, U. S. Attorney's Office, Western District of Pennsylvania (September 2, 2021): United States Files Suit Against UPMC, Its Physician Practice Group, and the Chair of Its Department of Cardiothoracic Surgery for Violating the False Claims Act (https://www.justice.gov/usao-wdpa/pr/united-states-files-suit-against-upmc-its-physician-practice-group-and-chair-its).

complications, especially when they occur in such complex cases as heart surgeries, increase patient morbidity and mortality and can lead to the necessity to re-do the surgery, to debilitating chronic conditions, or an early death.

90.     Even the prestigious Society of Thoracic Surgeons noticed the high rate of complications problem with Baylor when in 2016-17 it rated St. Luke's as among the worst performing hospitals in the nation for coronary artery bypass surgery, the most common open-heart operation, and a key indicator of a cardiac program's overall quality:

> • Of nearly 600 hospitals that voluntarily report surgical outcomes to the Society of Thoracic Surgeons, St. Luke's was one of 18 nationally to earn only one star for overall bypass quality, the group's lowest rating.
>
> • Between the middle of 2016 and the middle of 2017, 19.3 percent of the 494 patients who underwent bypass operations at St. Luke's suffered major complications, including strokes, kidney failure, prolonged time on a ventilator and infections, according to the society's analysis, which is adjusted to ensure hospitals are not penalized for treating sicker patients. That's compared to a national rate of 11.3 percent.
>
> • Among hospitals that performed at least 200 bypass operations, none recorded a higher rate of major complications than St. Luke's.

*See* Mike Hixenbaugh and Charles Ornstein, *ProPublica and Houston Chronicle*, "For Most Common Heart Surgery, St. Luke's Has Been Among the Nation's Worst," August 3, 2018 (https://www.propublica.org/article/st-lukes-heart-bypass-surgery-complications). And of course, Baylor knew about the complications, and also knew the Defendant surgeons were not following Medicare regulations in the conduct of overlapping heart surgeries. But Baylor never stopped the Defendant surgeons or corrected their conduct, but rather Baylor facilitated and encouraged the overlapping surgery practice and ignored the Medicare regulations violations, elevating added revenue as a priority over patient care.

91.     As stated previously, Defendant Baylor College of Medicine (BCM) is a co-owner of the hospital Baylor St. Luke's Medical Center (BSLMC), and each of the Defendant surgeons

had a financial relationship with the Defendant Baylor institutions. At all relevant times, these included that each of the Defendant surgeons held important positions at both Baylor institutions: (1) Dr. Ott (working though his entity Defendant Surgical Associates of Texas) was Chief of the Cardiovascular Service – BSLMC and Clinical Professor of Surgery – BCM; (2) Dr. Coselli was Professor, Vice-Chair, and Chief, Division of Cardiothoracic Surgery – BCM and Chief, Adult Cardiac Surgery Section and Associate Chief, Cardiovascular Service – BSLMC; and (3) Dr. Lamelas was Professor of Surgery and Associate Chief of the Division of Cardiothoracic Surgery – BCM and Associate Chief of Cardiac Surgery – BSLMC. Thus, each Defendant surgeon was in position to benefit financially from the Baylor Defendants to which they referred overlapped cases.

92.     The Baylor Defendants submitted, or caused to be submitted, for all overlapped Medicare-billed surgical cases, claims for reimbursement for Medicare Part A services, knowing that the underlying submission for Part B reimbursement was not accurate. The Baylor Defendants did so with a culpable mind: the Hospital scheduled the surgeries, provided the surgery rooms and staff, conducted audits of the Defendant surgeons' claims for Medicare reimbursement, were aware that teaching physicians were submitting attestations for reimbursement that could not be true, and utilized a false and misleading informed consent form in the patients' medical record. As a result, CMS overpaid for inpatient services it should not have had to pay.

93.     Submission of such Part A claims generated the additional revenue necessary to pay the Defendant surgeons' unreasonable salaries, in violation of the Stark Law. That is, the compensation for the Defendant surgeons paid by the Baylor Defendants was neither at fair market value nor commercially reasonable without taking into account the value of the illegal referrals. Indeed, on information and belief, the surgical fee reimbursement from legally conducted cases was not sufficient to cover each Defendant surgeon's compensation; thus, supplemental funds to

28

the financially intertwined Defendants medical school and hospital had to come from cramming additional cases into the schedule.

94.     For example, surgeon Defendant Lamelas admitted to Relator that his compensation package was tied to the number of cases he performed. On information and belief, the Lamelas compensation package exceeded $2 million per year, and it would be reasonable that Defendants Coselli and Ott, surgeons of comparable professional achievement and productivity, were compensated on a similar basis.

95.     With about $150 million in added revenue for the Defendant hospital during the period 2013 - 2020 because of the wholesale overlapping surgery practice from only the three Defendant surgeons, some of that financial benefit would flow to the Defendant medical school as part owner of the hospital, and some would be available to cover the surgeons' inflated compensation packages. On information and belief, it is estimated that the Defendant surgeons generated an average of about $10 million per year each in *added* revenue to the Defendant hospital as a direct result of the overlapping surgery practice, more than enough to supplement their compensation packages, either directly or through payments made to the Defendant medical school.

96.     The overlapping surgery practice by Defendants was the pathway to increased revenues and compensation by incentivizing the Defendant surgeons to artificially increase their apparent productivity for billing purposes, which in turn necessarily meant that the Defendant surgeons did not personally perform the surgical procedures but got credited for the work of others. In doing so, the Defendants violated federal regulations governing billing and claims submission.

97.     Moreover, there is no legitimate business purpose to the scheme engaged in by Defendants to perform overlapping complex cardiovascular surgeries in violation of multiple Medicare regulations, thereby unjustly enriching the hospital, overcompensating the surgeons,

compromising training and supervision of physician trainees, endangering patient care, and effectively double-charging the Government for services performed by residents.

98.     Government Payors have paid Defendants collectively hundreds of millions of dollars over the course of the last ten years from the date of the filing of this case to reimburse Defendants for the teaching surgical services and hospital services they falsely indicated were true and legal, and for the Medicare cases the surgeons improperly referred to Baylor. Defendants in turn have retained these overpayments despite knowing of their obligation to return them.

## VII.   CAUSES OF ACTION

### A. Presenting False Claims, 31 U.S.C. § 3729(a)(1)(A).

99.     Relator incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

100.    This is a claim for penalties and treble damages under the False Claims Act.

101.    By virtue of the acts described above, Defendants, for the purpose of defrauding the government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval to TRICARE or under the Medicare program, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

102.    As a result, federal monies were lost through payments made in respect to claims and other costs were sustained by the federal government.

103.    Therefore, the federal government has been damaged in an amount to be proved at trial.

### B. Making and Using False Records, 31 U.S.C. § 3729(a)(1)(B).

104.    Relator incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

105.    This is a claim for penalties and treble damages under the False Claims Act.

30

106.    By virtue of the acts described above, the Defendants, for the purpose of defrauding the federal government, knowingly made, used, and/or caused to be made or used, false records or statements material to a false or fraudulent claim paid or approved by TRICARE or under the Medicare program, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

107.    As a result, federal monies were lost through payments made in respect of the claims and other costs were sustained by the federal government.

108.    Therefore, the federal government has been damaged in an amount to be proved at trial.

C.  **False Claims Act Conspiracy, 31 U.S.C. § 3729(a)(1)(C).**

109.    Relator incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

110.    This is a claim for penalties and treble damages under the False Claims Act.

111.    By virtue of the acts described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B) and (G) (as alleged herein), within the meaning of 31 U.S.C. § 3729(a)(1)(C).

112.    As a result, federal monies were lost through payments made in respect of the claims and other costs were sustained by the federal government.

113.    Therefore, the federal government has been damaged in an amount to be proved at trial.

D.  **Unlawful Retention, 31 U.S.C. § 3729(a)(1)(G).**

114.    Relator incorporates all of the foregoing paragraphs by reference as if fully set forth herein.

115.    This is a claim for penalties and treble damages under the False Claims Act.

31

116.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or false statements that are material to an obligation to pay or transmit money to the federal government.

117.   Because Defendants have failed to reimburse the federal government for sums it unlawfully retained by virtue of the conduct described above, the United States has been damaged, and continues to be damaged, in a substantial amount to be proved at trial.

## VIII.   Jury Demand

118.   Relator respectfully demands a trial by jury on all issues to be tried in this matter in accordance with Federal Rule of Civil Procedure 38. Relator has tendered the jury fee.

## IX.   Prayer

119.   Relator prays for the following relief:

a.   That this Court enter a judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' violations of the False Claims Act;

b.   That this Court enter a judgment against Defendants for a civil penalty of not less than $5,000 and not more than $10,000, or as subsequently adjusted per applicable regulations, for each of Defendants' violations of the False Claims Act;

c.   That the United States and the Relator, respectively, recover all costs of this action, with interest;

d.   That the Relator be awarded all reasonable attorneys' fees in bringing this action;

e.   That the Relator be awarded the maximum "relator's share" allowed for the violations of the False Claims Act, in accordance with 31 U.S.C § 3730(d);

f.   That Relator be awarded prejudgment interest;

g.   That a trial by jury be held on all issues so triable; and

h.   That Relator and the United States of America receive all relief to which either or both may be entitled at law or in equity.

32

Respectfully submitted,

**AHMAD, ZAVITSANOS**
**& MENSING P.C.**

/s/ *David Warden*
David Warden
*Attorney-in-Charge*
Texas Bar No. 20856750
Fed. ID 1042
Joseph Y. Ahmad
Texas Bar No. 00941100
Fed. ID 11604
Nathan B. Campbell
Texas Bar No. 24097455
Fed. ID 2745040
1221 McKinney Street, Suite 2500
Houston, Texas 77010-2009
Telephone: (713) 655-1101
Facsimile: (713) 655-0062
dwarden@azalaw.com
joeahmad@azalaw.com
ncampbell@azalaw.com

**FOSTER YARBOROUGH PLLC**
Patrick Yarborough
Texas Bar No. 24084129
Fed. ID 2451377
917 Franklin, Suite 220
Houston, Texas 77002-1741
Telephone: (713) 331-5254
Facsimile: (713) 513-5202
patrick@fosteryarborough.com

**COUNSEL FOR RELATOR,**
**JEFFREY A. MORGAN, M.D.**

33

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Civil Procedure 4, I certify that I served the foregoing Relator's

Second Amended Complaint on the following:

**<u>*Via Hand Delivery*</u>**
U.S. Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, TX 77002

**<u>*Via Certified Mail—Return Receipt Requested*</u>**
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Dated: September 26, 2022

/s/ *David Warden*
David Warden